**UNITED STATES DISTRICT COURT**      **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| *versus* | § | CASE NO. 1:20-CR-78(3) |
| | § | |
| MARIUS LAZAR | § | |

## MEMORANDUM AND ORDER

By order (#111) dated November 3, 2023, the court granted in part and denied in part both Defendant Marius Lazar's ("Lazar") Motion to Strike Surplusage (#68) and Motion in Limine (#71).  In that order, the court also denied Lazar's Motion for Bill of Particulars (#70) but denied his Motion to Dismiss the Indictment (#67) only in part.  The court noted that it would "rule on Lazar's arguments pertaining to extraterritoriality, including his request that the overt acts relating to the murder-for-hire plot be dismissed, at a later juncture."  To that end, the court requested supplemental briefing on the predicate act relating to the murder-for-hire plot and also ordered the Government to file a sur-reply to Lazar's reply brief, which challenges, for the first time, the extraterritorial application of various federal drug trafficking offenses alleged in the indictment.  Accordingly, the Government filed its sur-reply and supplemental brief (#108), and Lazar filed a supplemental brief (#110).  Having considered the motion, the submissions of the parties, the record, and the applicable law, the court is of the opinion that Lazar's motion to dismiss, to the extent that it challenges the Government's use of solicitation of murder under Texas law as a predicate offense, should be granted.  Lazar's request that the overt acts related to the murder-for-hire plot be struck from the indictment, however, should be denied.  Further, Lazar's challenge to the extraterritorial application of various federal drug trafficking offenses and his as-applied due process challenge to 21 U.S.C. § 595 should also be denied.

I.      Background

On September 17, 2020, a grand jury in the Eastern District of Texas returned a two-count Indictment against Lazar and three codefendants, charging them in Count One with Conspiracy to Import and Export Cocaine and to Manufacture and Distribute Cocaine Intending, Knowing, and with the Reason to Believe that the Cocaine Will Be Unlawfully Imported into the United States, in violation of 21 U.S.C. § 963, and in Count Two with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h).  On November 4, 2020, the grand jury returned a First Superseding Indictment (#14), which added a fourth codefendant and included an additional count that charged Lazar and three of his codefendants with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d).  The First Superseding Indictment includes the Racketeering Conspiracy charge as Count One and alleges the 21 U.S.C. § 963 violation in Count Two and the 18 U.S.C. § 1956(h) violation in Count Three.

Under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), it is a crime to conspire to violate any substantive RICO provision.  18 U.S.C. § 1962(d) ("It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section").  Here, the Government alleges that Lazar and his codefendants conspired to violate 18 U.S.C. § 1962(c).  A necessary element of a § 1962(c) violation is participation through a "pattern of racketeering activity," and, to show that a defendant conspired to commit such a violation, the Government must show that a co-conspirator did or would engage in a "pattern of racketeering activity."  In this vein, the Racketeering Conspiracy charge in Count One of the First Superseding Indictment (#14) is based upon three categories of predicate acts.  Specifically, acts relating to

2

money laundering, acts involving a murder-for-hire plot, and acts involving trafficking in controlled substances.  This case is set for jury selection and trial on Monday, November 6, 2023.

II.      Analysis

Lazar, in his motion to dismiss and in his reply brief, raises various arguments relating to the predicate acts alleged in the First Superseding Indictment.  In particular, Lazar contends that: the Texas solicitation-of-murder offense does not apply extraterritorially; 21 U.S.C. § 848(e)(1)(A) is unable to support the overt acts relating to the murder-for-hire scheme in the absence of Texas's solicitation offense; the Government failed to allege predicate drug trafficking offenses such that they trigger extraterritorial jurisdiction; and the Government's prosecution of him under 21 U.S.C. § 959 constitutes a violation of due process.

A.      The Murder-For-Hire Plot as a Predicate Act

Although, "in general, 'United States law governs domestically,'" it "does not rule the world." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 339 (2016) (quoting *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007)).  This bedrock principle undergirds "the presumption against extraterritoriality." *Id*. ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." (citing *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 255 (2010))).  Applying this presumption,[1] the Supreme Court, in *RJR Nabisco*, determined "that § 1962 applies to foreign racketeering activity—but only to the extent

---

[1] More specifically, the United States Supreme Court applied this principle by way of a two-step framework.  At step one, courts "ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc.*, 579 U.S. at 337.  "If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *Id*.

3

that the predicates alleged in a particular case themselves apply extraterritorially."[2]  *Id*. at 339.  "If a particular statute does not apply extraterritorially, then conduct committed abroad is not 'indictable' under that statute and so cannot qualify as a predicate under RICO's plain terms."  *Id*.

A brief recitation of the facts underlying the alleged solicitation is necessary.  On or about June 2020, Lazar's co-conspirators began communicating with an individual whom they believed to be a "high-level drug trafficker" but who was actually an undercover Drug Enforcement Administration agent ("DEA agent").  Weeks later, the DEA agent traveled to Bucharest, Romania, for an in-person dinner meeting with Lazar's co-conspirators.  The next day, while the DEA agent was still in Romania, the indictment alleges that Lazar and one of his co-conspirators "solicited Person 1[3] (whom . . . LAZAR knew to use Beaumont, Texas as a base of operations) to arrange the murder of three people in Romania including Victim 1 and Victim 2, both rival drug traffickers and members of a rival motorcycle club."  The Government alleges that Lazar continued to communicate with the DEA agent in the days following the initial meeting—presumably, some of those communications occurred after the DEA agent had returned to Texas.  Importantly, however, all of the communications following the initial contact seem to

---

[2] In *RJR Nabisco*, the Court noted that "although respondents' complaint alleges a violation of RICO's conspiracy provision, § 1962(d), the parties' briefs do not address whether this provision should be treated differently from the provision (§ 1962(a), (b), or (c)) that a defendant allegedly conspired to violate."  579 U.S. at 341.  The Court then "assume[d] without deciding that § 1962(d)'s extraterritoriality tracks that of the provision underlying the alleged conspiracy."  *Id*.  Thus, the court determines, that "[t]he extraterritorial reach of § 1962(d) is commensurate with that of the conspiracy's underlying predicate acts."  *United States v. Bondarenko*, No. 217CR306JCMVCF, 2019 WL 2450923, at *8 (D. Nev. June 12, 2019).

[3] The DEA agent is identified as "Person 1" in the First Superseding Indictment.

4

relate to the initial solicitation in Romania.[4]  Thus, it seems clear that the solicitation of murder occurred in Romania.  Nonetheless, as discussed below, even if the original solicitation (or even a subsequent solicitation) occurred while Lazar was in Romania and the DEA agent was in Texas, extraterritorial jurisdiction would still not obtain.

### 1.    Solicitation Under Texas Law

The First Superseding Indictment lists "acts involving murder, chargeable under" the Texas Penal Code as the second of three predicate acts supporting Count One, the Racketeering Conspiracy charge.[5]  Lazar asserts that these acts (relating, in fact, to a murder-for-hire plot) do not qualify as "racketeering activity" because the required territorial jurisdiction is lacking under Texas Penal Code § 1.04.  The Government disagrees and contends that "Lazar's communications into Texas, and the conspirators' money transfers into Texas, all constitute 'conduct inside [Texas]'" because "an actor's transmittal of a communication into a geographic jurisdiction qualifies as 'conduct' within that jurisdiction."

---

[4] The Government contends in its response to the court's request for supplemental briefing, while citing no authority, that even if the solicitation offense was complete "after the first conversation, then the subsequent acts of solicitation would constitute additional, separate solicitation offenses."  As the Government sees it, "[b]y committing a crime in one jurisdiction, one does not immunize himself to commit the offense again in a different jurisdiction, as the defendant would have it."  Lazar responds by arguing that he "could not be indicted for multiple counts of criminal solicitation merely because the discussions about the murder-for-hire continued after the agent was first solicited, and there is nothing in the statute that suggests the Texas Legislature intended to authorize 'stop-action' prosecutions where every communication that follows the solicitation becomes its own distinct offense."  It appears that (and the Government cites no Texas authority to the contrary), "[j]ust as a conviction for a completed offense bars prosecution for an attempt to commit the same offense," a conviction for solicitation of murder would likely "bar[ ] conviction for conduct that, on the facts of the case, is demonstrably part of the commission of the greater offense."  *Cf. Patterson v. State*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004).  Here, it seems clear that all subsequent communications and actions were part of, or a factual continuation of (as discussed further below), the solicitation offense.

[5] The Government contends that this conduct violated Texas Penal Code §§ 1.04(a), 15.01, 15.02, 15.03, 19.02, and 19.03.

To determine whether the solicitation of murder under Texas law may be defined as "racketeering activity," and supply a RICO predicate offense, the conduct involved must be "chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1).  This leads to the question at issue here—whether Texas's solicitation offense applies extraterritorially to the conduct alleged in the First Superseding Indictment.  The Texas Penal Code clarifies when Texas criminal law applies to conduct outside of the state.  Regarding territorial jurisdiction, § 1.04 of the Texas Penal Code states:

> (a) This state has jurisdiction over an offense that a person commits by his own conduct or the conduct of another for which he is criminally responsible if:
>
> > (1) either the conduct or a result that is an element of the offense occurs inside this state;
> >
> > . . .
> >
> > (4) the conduct inside this state constitutes an attempt, solicitation, or conspiracy to commit, or establishes criminal responsibility for the commission of, an offense in another jurisdiction that is also an offense under the laws of this state.[6]

TEX. PEN. CODE § 1.04(a).  The parties agree that whether Lazar's conduct falls into § 1.04's scope determines if the murder-for-hire plot may serve as a predicate offense.

In the Government's view, after citing a series of cases from Texas as well as three other jurisdictions, this issue is all but cut-and-dried.  First, to support the proposition that Lazar's actions qualify as conduct in Texas, the Government cites three cases from various jurisdictions dealing with offenses other than solicitation.  *State v. Rimmer*, 877 N.W.2d 652, 672 (Iowa 2016)

---

[6] It is apparent from the First Superseding Indictment that the murder-for-hire plot contemplated killing individuals in Romania—not in Texas.  Accordingly, the Government focuses its arguments on only subparts (1) and (4).

(theft by deception and fraudulent submissions); *Commonwealth v. Vergilio*, 103 A.3d 831, 834 (Pa. 2014) (terroristic threats); *State v. Meyers*, 825 P.2d 1062, 1064 (Haw. 1992) (terroristic threats).  These cases, however, are quite distinct from the case at bar.  The two cases dealing with terroristic threats, for example, require that, "[o]nce uttered, the [threatening] words must be communicated to complete the offense."  *Meyers*, 825 P.2d at 1064; *see Vergilio*, 103 A.3d at 834 ("[T]he term, 'communicates,' as used in the terroristic threats statute, contemplates that *the threat be received*." (emphasis added)); *see also Rimmer*, 877 N.W.2d at 672 (citing both *Meyers* and *Vergilio* and concluding that the jurisdictional requirement is satisfied when "conduct or a result that is an *element of the offense* occurs in Iowa despite the defendants' ignorance of the physical location of the person being deceived" (emphasis added)).[7]  Stated differently, these cases contemplate situations in which the receipt of the communication (such as the threat) is an element of the offense.  Were that the case here, § 1.04(a)(1) would be satisfied.

---

[7] Although *Rimmer* cited both threat cases mentioned above, the Iowa Supreme Court's analysis was slightly different.  *See* 877 N.W.2d at 671-72.  Interpreting Iowa's own extraterritorial jurisdiction statute, the court concluded that it "provides jurisdiction when conduct or a result that is an element of the offense occurs in Iowa despite the defendants' ignorance of the physical location of the person being deceived."  *Id*.  It then held "that the defendants' phone calls to a nonresident victim's employee in Iowa that deceived him into authorizing payment of a false claim constitute[d] conduct or a result that occur[red] in Iowa even [though] the victim's payment [was] sent from another state."  *Id*.  Iowa's fraudulent submission statute states:  "A person commits a class 'D' felony if the person, with the intent to defraud an insurer, . . . [p]resents . . . any . . . oral statement . . . as part of, or in support of, a claim for payment . . . pursuant to an insurance policy, knowing that such . . . statement contains any false information concerning a material fact."  Iowa Code § 507E.3(2)(a).  Significantly, although not focused on by the court, the fraudulent submissions statute, by its own terms, appears to require that the oral statement actually be received—much like the threat cases above.  *Cf. Rimmer*, 877 N.W.2d at 672.  Nonetheless, the court found more convincing the fact that the individual within the state was induced, and thus deceived, by the telephone communication.  *Id*.  In its view, this effect was fairly classified as a result that was an element of the offense.  *Id*.  Moreover, the court noted that courts often "uphold criminal territorial jurisdiction based on an out-of-state defendant's telephonic communications with a *victim* or *accomplice* in the forum."  *Id*. (emphasis added).  As noted below, that justification is lacking in this case.

In contrast, under Texas law, "[t]he offense of solicitation is complete when the defendant has intent [that a capital felony be committed] and acts to induce another to engage in felonious conduct." *Saul v. State*, 510 S.W.3d 672, 684 (Tex. App.—El Paso 2016, pet. ref'd).  Receipt of the solicitation is not an element of the offense.  *Id.*; *see Jacob v. State*, 587 S.W.3d 122, 127 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) ("A person commits a solicitation-to-commit-capital-murder offense, if with intent that a capital murder be committed, the person 'requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding [the person's] conduct as the [person] believes them to be, would constitute [capital murder] or make the other a party to its commission.'"); *see also* BLACK'S LAW DICTIONARY 1427 (8th ed. 2004) (According to the Model Penal Code, "a defendant is guilty of solicitation even if the command or urging was not actually communicated to the solicited person, as long as it was designed to be communicated.").[8]  "The offense of criminal solicitation is completed when the culpable request or inducement to commit a capital felony or a first-degree felony is *unilaterally* presented." *Inscore v. State*, No. 13-09-00088-CR, 2010 WL 3420581, at *7 (Tex. App.—Corpus Christi–Edinburg Aug. 31, 2010, pet. ref'd) (emphasis added) ("Guilt of solicitation may be established solely by proving the communication and the culpable intent." (citing *State v. Brinkley*, 764 S.W.2d 913, 915 (Tex. App.—Tyler 1989, no pet.))).

The Government next cites a series of Texas cases to support its contention that the state has "uniformly adopted" the rule that "an actor's transmittal of a communication into a geographic

---

[8] It is worth noting that § 1.04 of the Texas Penal Code is strikingly similar to the Model Penal Code's territorial applicability provision.  MODEL PENAL CODE § 1.03.

jurisdiction qualifies as 'conduct' within that jurisdiction." *Carrillo v. State*, No. 08-04-00118-CR, 2005 WL 1992521, at *1 (Tex. App.—El Paso Aug. 18, 2005, no pet.) (harassment); *Reger v. State*, 598 S.W.2d 868, 870-71 (Tex. Crim. App. 1980) (theft of service); *Shappley v. State*, 520 S.W.2d 766, 768 (Tex. Crim. App. 1974) (unauthorized selling of securities). At the same time, the Government admits that it does not appear that Texas courts "have considered this rule in the context of solicitation offenses." Like the cases upon which the Government relies above, the Texas cases dealing with harassment and theft of services also noted that the offenses were not completed until an element of the offense occurred in the state. *See Reger*, 598 S.W.2d at 870-71 (noting that an element of the offense of theft of services—specifically, "secur[ing] performance of the services," not merely communicating a request for such services—occurred in Texas, as a result of the thief's phone call); *Carrillo*, 2005 WL 1992521, at *1 (noting that a "telephone communication" is an element of one of Texas's harassment statutes, and further explaining that "[i]n the context of the harassment statute, a telephone call does not become a 'telephone communication' until the call is *received*; therefore, a telephone communication occurs both at the location of the caller and the recipient." (emphasis added)). As such, they, too, are unpersuasive.

The Government then cites *Shappley*, a case in which Shappley had been "convicted for selling securities without hav[ing] been registered as a dealer or salesman in Texas." *Shappley*, 520 S.W.2d at 768. Shappley "made a telephone call from Scottsdale, Arizona, to Dr. Charles Cornwell in Marlin, Texas, offering to sell and soliciting subscriptions for certain securities." Shappley argued that he was not subject to prosecution in Texas because the sale was finalized in Arizona. *Id*. The Texas Court of Criminal Appeals disagreed and determined that Shappley's

9

phone call "at the very minimum amounted to an 'offer' to a person within the state." *Id*. Thus, in the court's view, "[c]riminal liability attached when [Shappley] commenced *dealing in securities* within the state, regardless of where the commercial technicality of 'delivery' was effectuated." *Id*. (emphasis added). Lazar, however, contends that *Shappley* is unhelpful because "the law applied in that case was much broader than capital felony solicitation—the appellant in *Shappley* could have been convicted for virtually any conduct involving 'dealing in securities,' so long as some aspect of that dealing touched and concerned the State of Texas."[9]

To be sure, *Shappley* presents a closer analogue to the case at bar, but it is ultimately unpersuasive. Lazar is correct that the statute at issue in *Shappley* seemed to apply more broadly and to encompass more conduct than the solicitation statute at issue here. Moreover, *Shappley* does not apply or cite Texas's territorial jurisdiction provision. In addition, at the time of the "offer," the victim was located in Texas—presenting a different interest for the state, as discussed below. Significantly, such minimal contacts (or even significant contacts) with Texas do not always give the state jurisdiction. *See, e.g.*, *McGowan v. State*, 938 S.W.2d 732, 735 (Tex. App.—Houston [14th Dist.] 1996) (applying § 1.04 of the Texas Penal Code and holding that Texas did not have jurisdiction over the "conduct oriented offense" of bribery where, "[a]lthough money was wired to [the defendant] from Texas and, presumably in exchange, documents were sent to Texas," the defendant did not solicit, accept, or agree to accept a benefit in Texas—that is, an element of the offense was not satisfied within the state), *aff'd sub nom. Weightman v. State*, 975 S.W.2d 621 (Tex. Crim. App. 1998).

---

[9] "Art. 581—29(A) makes it a felony for any person to sell, offer for sale or delivery, solicit subscriptions or orders for, dispose of, invite offers for, or *deal in any manner* in any security without being a registered dealer or salesman." *Shappley*, 520 S.W.2d at 768 (emphasis added).

In its response to the court's request for supplemental briefing, the Government cites Judge Womack's concurring opinion in *Whatley v. State* to support its contention that the offense of solicitation was not "complete" upon Lazar's communication. 946 S.W.2d 73, 77 (Tex. Crim. App. 1997) (Womack, J., concurring). At issue in *Whatley* was whether a deadly weapon finding was authorized under Texas law for the offense of solicitation. *Id.* at 76. The court determined that there was "no reason to exclude the offense of solicitation from felonies susceptible to a deadly weapon finding" because it was surely possible to use a gun when either requesting, commanding, or attempting to induce another to commit a certain offense. *Id.* Judge Womack wrote separately "to point out an amphiboly that can arise when judges say an offense was 'complete.'" *Id.* at 77 (Womack, J., concurring). Judge Womack noted that there is a difference between an offense being "legally complete" and "factually complete." *Id.* He determined that, although "as soon as each element has been committed" an offense is "legally complete," an offense may not yet be "factually completed." *Id.* Thus, he opined, if an individual were to use a firearm at any point before an offense is "factually complete," that offense would be susceptible to a deadly weapon finding. *Id.* Such an analysis, however, is futile in this case because § 1.04 of the Texas Penal Code, by its own terms, is concerned with legal completion. *See* TEX. PEN. CODE § 1.04 (providing jurisdiction when "conduct or a result that is an element of the offense occurs inside this state" or when "conduct inside this state constitutes an attempt, solicitation, or conspiracy to commit, or establishes criminal responsibility."). Furthermore, *Whatley*, like *Shappley*, does not discuss Texas's territorial jurisdiction provision. Indeed, the policy concerns involved in determining whether the state may seek a deadly weapon finding when prosecuting an individual clearly within its jurisdiction are substantially different than those involved in

11

determining whether the state possesses the requisite jurisdiction to prosecute an individual in the first instance.[10]

All told, the facts as alleged in the indictment show that Lazar's alleged solicitation offense was completed in Romania, when Lazar and one of his co-conspirators initially solicited the DEA agent. Moreover, were the initial solicitation made by telephone or message over the Atlantic, based on Texas's interpretation of its solicitation offense (requiring only a unilateral request), it too would have been completed in Romania. Thus, no "conduct or . . . result that is an element of the offense occur[red] inside" Texas, and no "conduct inside th[e] state constitute[d] an attempt, solicitation, or conspiracy to commit, or establishe[d] criminal responsibility."[11] TEX. PEN. CODE § 1.04(a)(1), (4). Such a conclusion is consistent with the justifications supporting extraterritorial jurisdiction. According to the Model Penal Code, "the state should be accorded jurisdiction over all those who engage in conduct that affects the state's interests." MODEL PENAL CODE § 1.03 explanatory note. Indeed, "§ 1.04 seeks to provide jurisdiction where Texas has at least some substantial connection to the offense." *Ex parte Ingram*, 533 S.W.3d 887, 903 (Tex. Crim. App. 2017). In this case, the victims (or intended targets) did not reside in Texas, and, while the DEA agent was based in Texas, a co-conspirator did not reside in the state.[12] Accordingly, as Lazar

---

[10] For these same reasons, the Government's references to cases finding solicitation to be a continuing transaction for venue purposes are unpersuasive. *See, e.g.*, *Tucker v. State*, 751 S.W.2d 919, 924 (Tex. App.—Fort Worth 1988, pet. ref'd).

[11] Although solicitation is antecedent to a conspiracy, even if the Government were to suggest that Lazar conspired with the DEA agent, it is clear that "an 'agreement' with a government agent cannot be the basis for a conspiracy conviction because a government agent does not share the accused's criminal purpose." *United States v. Delgado*, 672 F.3d 320, 341 (5th Cir.) (citing *Sears v. United States*, 343 F.2d 139, 142 (5th Cir. 1965)), *cert. denied*, 568 U.S. 978 (2012).

[12] Texas's interest shifts once a resident of the state is solicited and agrees to join in the criminal action. At that point, the solicitation has morphed into a conspiracy (assuming that the Texas resident is

frames this situation, this was a "Romanian murder-for-hire plot to kill Romanian nationals in Romania." Texas's territorial jurisdiction statute does not reach Lazar's conduct, and, as a result, the murder-for-hire plot is not punishable under Texas law. Thus, Texas's solicitation for murder offense cannot serve as a RICO predicate offense.

### 2.   21 U.S.C. § 848(e)(1)(A) as an Alternative

The Government attempts to fall back upon 21 U.S.C. § 848(e)(1)(A). It states that "even if Texas lacked jurisdiction over Lazar's plot to kill his rival, this conduct would still constitute racketeering activity because it would, if completed, constitute a violation of 21 U.S.C. § 848(e)(1)(A)."[13] Section 848(e)(1)(A) makes it a crime to "counsel[ ], command[ ], induce[ ], procure[ ], or cause[ ] the intentional killing of an individual" while engaging in certain drug offenses (punishable under 21 U.S.C. §§ 841(b)(1)(A), 960(b)(1)).[14] 21 U.S.C. § 848(e)(1)(A).

In the absence of the Texas solicitation offense, the Government's intent with respect to its reference to § 848(e)(1)(A) is not entirely clear. Above all, however, to the extent that the Government wishes to support the murder-for-hire plot with § 848(e)(1)(A) such that the scheme still qualifies as a third predicate act—its efforts are unavailing. The First Superseding Indictment alleges three distinct predicate acts to support the RICO conspiracy. The second predicate act,

---

not a government agent) such that Texas would have an interest in prosecuting the conspirators.

[13] Lazar's chief argument with respect to § 848(e)(1)(A) is that, in his view, it "only applies if 'the killing results.'" To qualify as a predicate act, it is, in reality, irrelevant that the scheme was not completed in this case. Because Lazar is charged under § 1962(d), it matters only that the predicate acts, "if completed, would satisfy all of the elements of a substantive" RICO offense. *Salinas v. United States*, 522 U.S. 52, 65 (1997).

[14] The court notes that, as the Government asserts, this statute clearly applies extraterritorially. *United States v. Vasquez*, 899 F.3d 363, 377 (5th Cir. 2018) ("In short, there is a clear, affirmative indication of congressional intent that § 848(e)(1)(A) apply extraterritorially."), *cert. denied*, 139 S. Ct. 1543 (2019).

relating to the murder-for-hire plot, is supported by only the Texas Penal Code solicitation offense.   The third predicate act, regarding "offenses involving trafficking in controlled substances," is based upon violations of 21 U.S.C. §§ 848(e)(1)(A), 952, 953, 959, 960, and 963. While § 848(e)(1)(A) is alleged in the predicate offense section, it is not alleged to support the murder-for-hire scheme as a predicate act on its own.   At this stage, were the Government to attempt to support the second predicate act with § 848(e)(1)(A) at trial (so that it could still prove the RICO conspiracy with any two of the three predicate acts alleged in the indictment), such an effort would equate to a constructive amendment of the indictment.   *See United States v. Sanders*, 966 F.3d 397, 407 (5th Cir. 2020) ("A constructive amendment occurs when [the court] permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which [he] was charged." (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir.), *cert. denied*, 562 U.S. 1006 (2010))).[15]   As a result, the Government cannot support a third predicate offense with § 848(e)(1)(A) because to do so would

---

[15] In *Sanders*, the United States Court of Appeals for the Fifth Circuit determined that an indictment was constructively amended where Sanders was "convicted under facts different from those charged in the indictment."   966 F.3d at 407.   Sanders, convicted of "sex trafficking of underage females," was charged "with knowing that the females were minors, and yet, [he] was convicted with no proof that he knew that Jane Does 2 and 4 were underage."   *Id*.   "Thus, by instructing the jury that Sanders could be convicted even if he did not know that Jane Does 2 and 4 were minors, the district court permitted Sanders to be convicted under facts different from those charged in the indictment."   *Id*.   The Fifth Circuit has often "concluded that 'substantial factual difference[s]' between the allegations in the indictment and proof offered at trial constructively amended the indictment."   *Id*.; *see United States v. Nuñez*, 180 F.3d 227, 232-34 (5th Cir. 1999) (determining that an indictment was constructively amended where it charged the defendant with "resisting arrest by means of a firearm" but the jury convicted the defendant of merely "resisting arrest"); *see also United States v. Cancelliere*, 69 F.3d 1116, 1121-22 (11th Cir. 1995) (finding a constructive amendment where the indictment included the word "willfully" in two money laundering counts—even though willfulness is not an element of money laundering—because "changing the requirement from proof of 'knowingly and willfully' to 'knowingly' impermissibly broadened the bases for Cancelliere's conviction").

allow Lazar to be convicted "on a materially different theory or set of facts than that with which [he is] charged." *Id*.

Doubtless, however, the Government wishes to put on evidence of the murder-for-hire plot at trial. Accordingly, it argues that § 848(e)(1)(A) qualifies as "racketeering activity,"[16] and, thus, evidence of the plot is relevant to establish the predicate act involving trafficking in controlled substances. Even assuming, *arguendo*, that § 848(e)(1)(A) does not qualify as a "racketeering activity," nonetheless, evidence relating to the murder-for-hire scheme will generally be admissible at trial. Just as the court has previously determined that acts that do not directly relate to the pattern of racketeering activity are relevant, the murder-for-hire plot is relevant because the overt acts referring to the plot allege actions that Lazar took on behalf of the enterprise. *See United States v. Krout*, 66 F.3d 1420, 1425 (5th Cir. 1995) ("The government is not limited in its proof of a conspiracy or racketeering enterprise to the overt or racketeering acts alleged in the indictment." (citing *United States v. Wilson*, 657 F.2d 755, 763 (5th Cir.1981), *cert. denied*, 455 U.S. 951 (1982))), *cert. denied*, 516 U.S. 1136 (1996). Furthermore, overt acts relating to the scheme that are not specifically identified as predicate acts need not be struck from the indictment. *See id.*; *see also United States v. Johnson*, 825 F. App'x 156, 172 (5th Cir. 2020), *cert. denied*,

---

[16] Particularly, on this point the Government argues that "a violation of [§] 848(e)(1)(A) definitionally qualifies as racketeering activity" because 18 U.S.C. § 1961(1)(D) "defines racketeering activity to include 'any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . , punishable under any law of the United States.' 18 U.S.C. § 1961(1)(D)." It continues that § "848(e)(1)(A) has, as an element, the commission of a predicate felony drug offense," and thus it "is an offense 'involving' felonious drug dealing, qualifying it as racketeering activity." It cites *United States v. Snow*, 48 F.3d 198, 201 (6th Cir. 1995), for the proposition that § 848(e)(1) is a federal "drug law." *Snow* made this determination for the purposes of determining whether § 848(e)(1) may qualify as the object of an 21 U.S.C. § 846 conspiracy. 48 F.3d at 201. Lazar's primary argument in opposition, that the offense must have been completed—*i.e.*, "there are no dead bodies"—is irrelevant (as discussed above).

141 S. Ct. 1112 (2021).  Moreover, the fact that overt acts relating to the scheme are alleged in the indictment provides Lazar "ample notice" of their potential admission at trial.  *See Johnson*, 825 F. App'x at 172.

In sum, because the murder-for-hire plot may not serve as a predicate act to support the RICO conspiracy as alleged, the reference to "acts involving murder, chargeable under Tex. Penal Code §§ 1.04(a), 15.01, 15.02, 15.03, 19.02, and 19.03" as a predicate act in the First Superseding Indictment should be struck from the indictment (#14, p.7, ¶ b).  Furthermore, for this reason, the reference to the murder-for-hire plot in the notice of special sentencing factors should also be struck (pp.14-15, ¶¶ 2-3).  Such conduct may not serve to enhance Lazar's sentence, should he be convicted.  The overt acts referencing the plot, however, need not be struck from the indictment.  Additionally, Count One remains and is not deficient because there are still two predicate acts alleged in the indictment.

B.      Drug Trafficking Predicate Offenses and Extraterritorial Jurisdiction

Lazar next contends that the Government "has failed to allege a predicate drug trafficking offense that triggers extraterritorial jurisdiction."  More specifically, Lazar asserts that "[t]he Government's pleadings utterly fail to establish any intent by any real conspirator for any of their conduct to touch or concern the United States, much less for any criminal agreement to be consummated within the United States' territorial boundaries."  The Government, however, retorts that "[a]t multiple points the indictment alleges that the conspirators expressly contemplated that the drugs would pass through the United States on their way to Romania and New Zealand."

The Fifth Circuit, in *Ricardo*, clarified that "when the statute itself does not require proof of an overt act, jurisdiction attaches upon a mere showing of intended territorial effects."[17] *United States v. Ricardo*, 619 F.2d 1124, 1129 (5th Cir.) (citing *United States v. Postal*, 589 F.2d 862, 886 n.39 (5th Cir.), *cert. denied*, 444 U.S. 832 (1979)), *cert. denied*, 449 U.S. 1063 (1980); *Garcia-Velasquez v. United States*, No. 8:08-CR-24-T-30AEP, 2013 WL 6051642, at *4 (M.D. Fla. Nov. 15, 2013) (noting that this is also the law in the United States Court of Appeals for the Eleventh Circuit because *Ricardo* was decided prior to the formation of the circuit).  In any event, as the Government points out, the First Superseding Indictment alleges at various points that Lazar's co-conspirators intended for their conduct to have an effect on the United States.

For instance, Overt Act 6 notes that two of Lazar's co-conspirators "attended a dinner meeting in Bucharest, Romania, at which they discussed the pending cocaine purchase, including . . . the use of Beaumont, Texas as a base for receiving payment, fabricating industrial machinery in which to conceal the drugs, and exporting the drugs from the United States."  Overt Act 16 alleges that one of Lazar's co-conspirators "discussed details of the pending 400-kilogram cocaine shipment, including the routing of the cocaine through Beaumont, Texas."  Additionally, Overt Act 23 asserts that another of Lazar's co-conspirators "discussed the details of the 400-kilogram cocaine transaction, including the use of Beaumont, Texas as a base for receiving payment, fabricating industrial machinery in which to conceal the drugs, and exporting the drugs

---

[17] The parties appear to agree that the indictment must allege intended territorial effects.

17

from the United States." As such, the indictment plainly alleges the conspirators' intent that their conduct touch and concern the United States.[18]

Furthermore, to the extent that Lazar challenges the extraterritorial applicability of the offenses alleged in connection with the drug trafficking predicate act, such a challenge is unsuccessful. As the Government pointed out in its sur-reply, these drug offenses have been found to apply extraterritorially. *See Vasquez*, 899 F.3d at 377 (noting that 21 U.S.C. § 848(e)(1)(A) applies extraterritorially "at least to the extent that the underlying predicate offenses do"); *United States v. Lawrence*, 727 F.3d 386, 395 (5th Cir. 2013) (noting that 21 U.S.C. "§ 963 can be applied extraterritorially."), *cert. denied*, 571 U.S. 1222 (2014); *United States v. Salcedo-Ibarra*, No. 8:07-CR-49-T-27TGW, 2009 WL 1953399, at *3 (M.D. Fla. July 6, 2009) (noting that 21 U.S.C. § 953 can be applied extraterritorially); *United States v. Noriega*, 746 F. Supp. 1506, 1515 (S.D. Fla. 1990)("With respect to 21 U.S.C. § 952, it is apparent from the very nature of the offense that the statute was intended to reach extraterritorial acts."), *aff'd*, 117 F.3d 1206 (11th Cir. 1997); *see also* 21 U.S.C. § 959(d) ("This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."). Accordingly,

---

[18] Contrary to Lazar's contention, the fact that conspirators "intended the conspiracy to be consummated within the territorial boundaries" of the United States is but one way to "satisf[y] jurisdictional requisites." *Ricardo*, 619 F.2d at 1129. In fact, *Ricardo* noted that a "district court had jurisdiction to try the defendants for a conspiracy aimed at violating United States law and intending effects in its territory even in the absence of proof of an overt act committed within this country." *Id.* (quoting *United States v. Mann*, 615 F.2d 668, 671 (5th Cir. 1980), *cert. denied*, 450 U.S. 994 (1981)). While this conclusion in particular may be contrary to Justice Holmes's views (Lazar discusses, at length, Justice Holmes's trepidations with respect to an overly liberal application of overt acts to jurisdiction and venue requirements), it is similar to this case in that jurisdiction existed even though no overt act clearly occurred while one of the co-conspirators was within the United States and the conspiracy was not consummated in the United States. *See Mann*, 615 F.2d at 671; *see also Hyde v. United States*, 225 U.S. 347, 386 (1912) (Holmes, J., dissenting).

at bottom, the First Superseding Indictment adequately alleges the predicate drug offenses such that the offenses apply extraterritorially in this case.

C.    Lazar's As-Applied Due Process Challenge to 21 U.S.C. § 959

In his reply brief, Lazar asserts for the first time that the Government's prosecution of him under 21 U.S.C. § 959[19] constitutes a violation of due process.  Despite conceding that § 959 applies extraterritorially, Lazar nevertheless contends that he may not be prosecuted under this statute because a sufficient nexus does not exist between his conduct and the United States.  In particular, Lazar argues that "[t]he sole reason the United States is implicated in the indictment at all stems from the [DEA] Agent's fictionalized route of travel and fictionalized 'base of operation' in Beaumont, Texas."  According to Lazar, these "fictional details [were] deliberately crafted by the United States to attach jurisdiction," which violates his right to due process.

1.    Due Process Principles for Foreign Defendants

As Lazar acknowledges, the Fifth Circuit has confirmed that § 959 applies extraterritorially.[20]  *See Vasquez*, 899 F.3d at 376 ("[W]e have held that the statutes prohibiting conspiracies to commit either of the predicate offenses, 21 U.S.C. §§ 846, 963, apply to purely extraterritorial conduct intended to affect the United States." (citing *United States v. Rojas*, 812

---

[19] Section 959(a) of Title 21 of the United States Code provides:  "It shall be unlawful for any person to manufacture or distribute a controlled substance . . . intending, knowing, or having reasonable cause to believe that such substance . . . will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States."  21 U.S.C. § 959(a).  Lazar and his co-conspirators are charged with violating § 959 in the third pattern of racketeering activity identified in Count One of the First Superseding Indictment—"offenses involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 848(e)(1)(A), 952, 953, 959, 960, and 963."  In addition, Count Two of the First Superseding Indictment charges Lazar and his co-conspirators with conspiring to commit various narcotics offenses, including a violation of § 959.

[20] Indeed, the statute explicitly states:  "This section is intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."  21 U.S.C. § 959(d).

F.3d 382, 392-93 (5th Cir.), *cert. denied*, 578 U.S. 1027 (2016))).  When determining whether a statute may be applied extraterritorially, "[i]n the context of non-U.S. citizens, 'due process requires the government to demonstrate that there exists "a sufficient nexus between the conduct condemned and the United States" such that application of the statute would not be arbitrary or fundamentally unfair to the defendant.'"  *Rojas*, 812 F.3d at 393 (quoting *Lawrence*, 727 F.3d at 396).  In order to evaluate this nexus, courts within the Fifth Circuit look to "the aim of the charged activity and fair-warning principles."  *United States v. Rafoi*, 60 F.4th 982, 995 (5th Cir. 2023).  "[A] jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."  *Rojas*, 812 F.3d at 393 (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011), *cert. denied*, 566 U.S. 986 (2012)).  Importantly, the Fifth Circuit has held that this nexus is met where "the defendants were charged with acting with the intent or knowledge that drugs would be unlawfully imported into the United States." *Id.*; *see Lawrence*, 727 F.3d at 394 ("[O]ther circuits have asserted that the United States government may make efforts to stem the international drug trade 'without any showing of any actual effect on the United States' because of the threat that the international drug trade presents to the nation's ability to function." (quoting *United States v. Perlaza*, 439 F.3d 1149, 1162 (9th Cir. 2006))).

As for fair warning principles, "[f]air warning does not require that the defendants understand that they could be subject to criminal prosecution *in the United States* so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere."  *Rafoi*, 60 F.4th at 955 (quoting *Rojas*, 812 F.3d at 393).  Notably, in a prior case affirming the district court's application of 21 U.S.C. § 959 extraterritorially, the

Fifth Circuit explicitly recognized that "drug trafficking is condemned universally by law-abiding nations." *Rojas*, 812 F.3d at 393 (quoting *United States v. Suerte*, 291 F.3d 366, 371 (5th Cir. 2002)).

Here, the First Superseding Indictment establishes a sufficient nexus between Lazar's charged conduct and the United States such that his prosecution under § 959 does not violate due process. First, the aim of the relevant activity with which Lazar is charged in the indictment is to cause harm inside the United States or to United States interests, in that multiple overt acts in the indictment allege that Lazar and his co-conspirators intended to import and export cocaine to and from the United States. *See Rafoi*, 60 F.4th at 995; *Rojas*, 812 F.3d at 393. For instance, Overt Act 8 alleges that Lazar and a co-conspirator "negotiated a 10-kilogram cocaine purchase to be exported from Beaumont, Texas, for distribution in Romania." Additionally, Overt Act 6 alleges that two co-conspirators discussed "the use of Beaumont, Texas as a base for receiving payment, fabricating industrial machinery in which to conceal the drugs, and exporting the drugs from the United States." Therefore, the indictment sufficiently alleges that, by conspiring to channel the enterprise's drug trafficking activities through the United States, Lazar and his co-conspirators aimed to cause harm to the United States and its interests.

As for the second prong of the due process analysis, fair warning principles are clearly satisfied here. As the Fifth Circuit has held, because law-abiding nations "universally" criminalize drug trafficking, Lazar could reasonably understand that his participation in the conspiracy to import and export cocaine constituted criminal conduct that could expose him to prosecution in any "law-abiding" country. *Rojas*, 812 F.3d at 393. Thus, the Government's prosecution of Lazar under § 959 does not violate due process.

21

2.      The DEA Agent's Impact on the Jurisdictional Nexus

Despite the clear satisfaction of the due process principles for foreign defendants as described above, Lazar nevertheless alleges that his prosecution under § 959 violates due process because the DEA agent fabricated "fictional details [that were] deliberately crafted by the United States to attach jurisdiction."  Lazar cites no authority to support his contention that the United States may not exercise jurisdiction where a Government agent purportedly played some role in facilitating the nexus between the United States and the defendant's criminal conduct that violates United States law.[21]  In response, the Government cites a United States Court of Appeals for the Second Circuit case—*United States v. Al Kassar*—for the proposition that extraterritorial jurisdiction may be appropriately exercised over defendants who were indicted following "a sting operation taking place entirely outside the United States and involving solely foreign citizens." 660 F.3d at 118.

A closer examination of the underlying facts in *Al Kassar* is warranted.  In *Al Kassar*, undercover DEA agents posed as members of FARC, a Colombian terrorist organization, when meeting with al Kassar, a Spanish national and resident whom the United States government had long suspected of engaging in illegal arms trafficking.  *Id.* at 115.  The undercover DEA agents told al Kassar that they were interested in purchasing weapons for FARC to use against the United States military in Colombia.  *Id.* at 116.  Al Kassar agreed to supply the weapons and was later arrested in Spain with false documentation for the requested weapons.  *Id.*  On appeal following

---

[21] The cases that Lazar cites in this section of his reply brief—*United States v. Ghanem*, 993 F.3d 1113, 1132 (9th Cir. 2021);  *United States v. Brehm*, 691 F.3d 547, 552 (4th Cir.), *cert. denied*, 568 U.S. 1076 (2012); and *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir.), *cert. denied*, 540 U.S. 933 (2003)—merely set out the general extraterritorial due process framework and do not analyze the specific issue of "fabricated jurisdiction" that Lazar raises.

al Kassar's conviction,[22] the Second Circuit confirmed that the United States properly exercised jurisdiction over the case, even though "the investigation took place abroad and focused only on foreign persons," because al Kassar and his co-conspirators intended to "sell arms to FARC with the understanding that they would be used to kill Americans and destroy U.S. property; the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States." *Id.* at 118.  Additionally, the court rejected al Kassar's argument that "any jurisdictional nexus was created entirely by acts of the DEA agents who 'manufactured' jurisdiction over the defendants in violation of due process" because, although the DEA agents broached the subject of obtaining weaponry to use against the United States military, al Kassar and his co-conspirators responded by "conspiring among themselves to acquire and sell these weapons to what they believed was a terrorist organization with knowledge that the weapons would be used to kill Americans," and thus "every element of the crimes of conviction was established by evidence of voluntary action by the defendants." *Id.* at 119.[23]

In the case at bar, the propriety of exercising extraterritorial jurisdiction is more clear-cut than in *Al Kassar*, given that the indictment alleges that Lazar's co-conspirators not only took actions while abroad to further the aims of the conspiracy but also engaged in conduct that directly impacted the United States.  For example, Overt Act 20 alleges that a conspirator deposited a sum of money that included "partial payment for the planned 400-kilogram cocaine shipment" in a

---

[22] Al Kassar was convicted of conspiring to kill United States citizens, conspiring to kill United States officers and/or employees, conspiring to acquire and export certain anti-aircraft missiles, conspiring to provide material support to a known terrorist organization, and money laundering.  *Id.* at 116.

[23] Notably, the Fifth Circuit has cited *Al Kassar* favorably, albeit not in a case involving the same sort of "fabricated jurisdiction" issue presented here and, accordingly, not for the above-mentioned propositions.  *See Rojas*, 812 F.3d at 393.

Texas-based bank account, which constitutes a concrete action that was taken in (or at the very least, directed toward) the United States in furtherance of the conspiracy.  Additionally, while Lazar claims that the jurisdictional nexus for his prosecution under § 959 relies on only the "fabricated, incidental details of a government agent," as in *Al Kassar*, he and his co-conspirators nevertheless seized the opportunity that was purportedly presented by the DEA agent and intentionally acted with an aim antithetical to the interests of the United States.  As the aforementioned overt acts reveal, Lazar and his co-conspirators are alleged to have conspired to use Beaumont, Texas, as a location for channeling and concealing the cocaine that they intended to traffic internationally.  A conspiracy with such aims necessarily harms the interests of the United States in protecting its borders and citizens against the unlawful importation of controlled substances.  In other words, like the conspirators in *Al Kassar*, Lazar and his co-conspirators are alleged to have taken "voluntary action[s]"—such as discussing and negotiating the use of Beaumont, Texas, as a location for routing cocaine to Romania and New Zealand—that, if proven, would demonstrate that they intentionally acted in a manner that satisfied the elements of conspiring to import cocaine into the United States in violation of § 959.[24]  *Id.*  Accordingly, the United States's exercise of jurisdiction appears similarly appropriate in this case.

--------

[24] Additionally, it is of no moment that, as Lazar asserts, the conspiracy was "aimed at cocaine distribution in Romania and New Zealand," because the conspiracy nonetheless allegedly involved an agreement to import cocaine into the United States.  This importation alone would plainly violate § 959(a), which contains no textual requirement that the imported controlled substance be intended for distribution in the United States.  *Cf. Lawrence*, 727 F.3d at 394-95 (holding that the United States could properly exercise extraterritorial jurisdiction over United States citizens who were charged with violating § 959(b), even though the defendants were traveling between two foreign nations and intended to distribute the drugs in the United Kingdom, in part because, when enacting the statute, Congress relied on "the United States' status as a party to 'international conventions designed to establish effective control over *international* and domestic traffic in controlled substances.'" (citing 21 U.S.C. § 801)).

Furthermore, while recognizing that *Al Kassar* is not binding authority, the court's reliance on that case is supported by the Fifth Circuit's parallel reasoning when assessing a "manufactured jurisdiction" challenge to the interstate commerce element of a federal offense in *United States v. Clark*, 62 F.3d 110 (5th Cir. 1995), *cert. denied*, 516 U.S. 1058 (1996). In *Clark*, the Fifth Circuit determined that the interstate commerce element of a federal offense was properly satisfied where a government agent admitted to taking "steps to ensure the existence of the interstate element of the offense," but "the defendant voluntarily and of his own free will did the act that caused the interstate element to exist." *Id.* at 114.[25] In order to arrive at this conclusion, the court relied on a Second Circuit case with extraterritorial implications, explaining:

> As in *United States v. Lau Tung Lam* where the government had "an entirely legitimate interest in identifying and apprehending European drug dealers willing to bring narcotics to this country for sale," in the present case the government had a legitimate interest in identifying and apprehending car thieves who are willing to steal cars in one state and transport them to another for disposition. . . . Thus, if a "manufactured federal jurisdiction" concept has a place in federal criminal law, it has no place in this case.

*Id.* (internal citation omitted) (citing 714 F.2d 209, 210 (2d Cir.), *cert. denied*, 464 U.S. 942 (1983)).

Notably, *Lau Tung Lam* involved a situation where, prior to his interactions with an undercover DEA agent, the defendant "had expressed an interest in selling heroin only in Europe," yet he agreed to deliver heroin to the United States at the undercover agent's request and was subsequently arrested in New York with the drugs in his possession. 714 F.2d at 210. On

---

[25] Specifically, the government agent requested that the defendant deliver stolen vehicles from Texas to Oklahoma. *Id.* at 111. The Fifth Circuit inferred from the record that the government agent's request "had as its sole purpose the satisfaction of the interstate elements of the offenses," which included interstate transportation of stolen motor vehicles, conspiring to commit the interstate transportation of stolen motor vehicles, and conspiring to possess and dispose of stolen motor vehicles. *Id.*

appeal, the defendant argued that no crime would have existed in the United States "but for the conduct of the Government's agents who themselves created the federal nexus which permitted prosecution."[26]  *Id*.  The Second Circuit rejected the defendant's challenge and affirmed his conviction, holding that the government "has an entirely legitimate interest in identifying and apprehending European drug dealers willing to bring narcotics to this country for sale."  *Id.*

In sum, although *Clark* does not address the precise issue that Lazar raises here, the court nevertheless gleans from its reasoning, including its reliance on *Lau Tung Lam*, that the Fifth Circuit has expressed disapproval of the concept of "manufactured federal jurisdiction" in criminal cases.  In the same vein, *Clark* indicates the Fifth Circuit's seeming endorsement, albeit in dicta, of exercising jurisdiction over foreign defendants like Lazar who, when presented with the opportunity, voluntarily engage in conduct that is aimed at harming the interests of the United States.  Hence, in light of the foregoing and Lazar's failure to provide any case law in support of his position, the court declines to hold that the Government's prosecution of Lazar under § 959 is an unconstitutional exercise of extraterritorial jurisdiction.[27]

---

[26] Interestingly, the defendant did not frame his argument as a due process challenge.  *Id*.  Instead, he claimed that the Second Circuit "should exercise its supervisory authority over the administration of federal criminal justice by dismissing the indictment."  *Id*.  Nonetheless, the defendant's argument contesting the government agent's role in creating jurisdiction parallels Lazar's due process argument in the present case.

[27] The court also rejects Lazar's argument that, because a conspiracy cannot exist between a government agent and another participant, the United States lacks jurisdiction to prosecute Lazar for conspiring to violate § 959.  Despite his correct articulation of conspiracy law, Lazar's assertion fails to support his jurisdictional argument.  While Lazar appears to contend that United States jurisdiction may not attach because he "conspired" to violate 21 U.S.C. § 959 with only a Government agent, he seemingly ignores that multiple overt acts in the indictment allege that Lazar's co-conspirators were aware of and involved in the conspiracy to import and export cocaine to and from the United States.  For example, as mentioned above, Overt Act 6 alleges that two of Lazar's co-conspirators, Murray Michael Matthews ("Matthews") and Marc Patrick Johnson ("Johnson"), both attended a dinner meeting where they discussed "the use of Beaumont, Texas as a base for receiving payment, fabricating industrial machinery in which

Moreover, Lazar's argument that details of the conspiracy—including the "use of a U.S. bank account for funding"—were "fictional" is contradicted by allegations in the indictment.  In particular, Overt Act 20 alleges that a member of the conspiracy "caused three transactions resulting in the total deposit of approximately $629,182 USD into a Texas-based bank account, intended for withdrawal in Beaumont, Texas," with a portion of that sum constituting "partial payment for the planned 400-kilogram cocaine shipment."[28]  In other words, the connection to the United States is not merely "fictional," as the indictment alleges that the conspirators took concrete steps—including making a nonfictional deposit—toward furthering the conspiracy to import and export cocaine.[29]

Finally, the court observes that the First Superseding Indictment contains no allegations revealing how the DEA agent became involved with Lazar and his co-conspirators or confirming that the DEA agent was, in fact, the first individual to suggest the use of the United States as part of the cocaine trafficking conspiracy.  Accordingly, in view of Lazar's failure to support his

---

to conceal the drugs, and exporting the drugs from the United States."  Additionally, Overt Act 8 alleges that Matthews and Lazar "negotiated a 10-kilogram cocaine purchase to be exported from Beaumont, Texas, for distribution in Romania by LAZAR and others."  Thus, the indictment contains several allegations demonstrating that the jurisdictional nexus for § 959 is not based solely on an agreement between Lazar and the DEA agent; indeed, the indictment makes clear that multiple members of the conspiracy were involved in the efforts to import and export cocaine to and from the United States.

[28] Overt Act 16 alleges that the "pending 400-kilogram cocaine shipment" was intended to be routed "through Beaumont, Texas, on its way to Romania and New Zealand."

[29] Furthermore, under general principles of conspiracy law, a defendant may be charged with and convicted of a conspiracy even where the object of the conspiracy was factually impossible.  *See, e.g.*, *United States v. Martinez-Brilia*, No. 21-20386, 2022 WL 6316523, at *4 (5th Cir. Oct. 10, 2022) ("[F]actual impossibility does not preclude a conviction for conspiracy or attempt." (quoting *United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005))), *cert. denied*, 143 S. Ct. 1038 (2023); *United States v. Thomas*, 690 F.3d 358, 369 (5th Cir. 2012) ("Because the act of conspiracy is complete upon the formation of an illegal agreement, a defendant can be convicted of conspiracy to aid in the distribution of drugs even if those drugs are fake." (quoting *Burke*, 431 F.3d at 886)).

27

position with either allegations in the indictment or case law, and considering the allegations in the indictment indicating that Lazar conspired to import cocaine into the United States and consequently acted with an aim to harm the interests of the United States, the court rejects the notion that the Government's prosecution of Lazar under 21 U.S.C. § 959 constitutes a violation of due process.

III.   Conclusion

In accordance with the foregoing analysis, Lazar's Motion to Dismiss the Indictment (#67) is GRANTED in part—that is, only to the extent that it challenges the Government's use of solicitation of murder under Texas law as a predicate offense—and DENIED in part. Accordingly, the Government is ordered to strike the reference to "acts involving murder, chargeable under Tex. Penal Code §§ 1.04(a), 15.01, 15.02, 15.03, 19.02, and 19.03" in the First Superseding Indictment (#14, p.7, ¶ b) as well as the reference to the murder-for-hire plot in the notice of special sentencing factors (pp.14-15, ¶¶ 2-3).  The court finds Lazar's contentions challenging the predicate drug trafficking offenses' extraterritorial application and those raising due process concerns relating to 21 U.S.C. § 959 to be without merit.

SIGNED at Beaumont, Texas, this 5th day of November, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE