| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 1:20-CR-78(3) |
| | § | |
| MARIUS LAZAR | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Marius Lazar's ("Lazar") Motion for New Trial (#153). Lazar contends that a new trial is warranted because the court denied his requested spoliation instruction and *Roviaro* motion. The Government filed a response (#154) in opposition. Having considered the motion, the Government's response, the record, and the applicable law, the court is of the opinion that Lazar's motion for new trial should be denied.

I.  Background

On September 17, 2020, a grand jury in the Eastern District of Texas returned a two-count Indictment against Lazar and three codefendants, charging them in Count One with Conspiracy to Import and Export Cocaine and to Manufacture and Distribute Cocaine Intending, Knowing, and with the Reason to Believe that the Cocaine Will Be Unlawfully Imported into the United States, in violation of 21 U.S.C. § 963, and in Count Two with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). On November 4, 2020, the grand jury returned a First Superseding Indictment (#14), which added a fourth codefendant and included an additional count that charged Lazar and three of his codefendants with Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d).

Over the course of an eight-day trial, the jury heard testimony and viewed numerous exhibits detailing Lazar's involvement in the charged conspiracies. The Government's key witness

was Drug Enforcement Administration ("DEA") Special Agent Christopher Diaz ("Agent Diaz"). During his testimony, Agent Diaz clarified that his investigation into Lazar and his co-conspirators began after receiving a tip from "Lee," a confidential informant, on the DEA's tip line. Lee, who was incarcerated in New Zealand at the time, informed Agent Diaz of an individual named Cui who was interested in purchasing large quantities of narcotics. Soon thereafter, Agent Diaz began to communicate with Cui, who was also incarcerated in New Zealand, and who would later become one of Lazar's co-conspirators. Agent Diaz took on the persona of a "cartel boss," and his first communication with Cui, who used the screen name "Dmted," was on the messaging platform Wickr me ("Wickr"). Wickr functions much like any other platform that allows messaging, voice calling, and video calling; however, Wickr is an end-to-end encrypted service that deletes messages previously sent after a specific time frame selected by the user. Eventually the conspiracy spread to Romania, that is, after making contact with Cui, Agent Diaz began to communicate with Lazar's other co-conspirators and later with Lazar himself, a citizen of Romania. Beyond in-person meetings, Agent Diaz communicated with Lazar exclusively over Wickr. To preserve these communications and circumvent Wickr's auto-deletion feature, Agent Diaz used a second phone's camera to record the screen of the phone that he used to access and send messages over Wickr. Those recordings were admitted as evidence during Lazar's trial. As established at trial, the conspiracies included, among other things, a murder-for-hire plot to eliminate rival drug distributors in Romania as well as a scheme to ship quantities of cocaine from Peru, via the United States, to Romania and New Zealand.

      During trial, Lazar raised two issues that are pertinent to this motion: (1) he argued that the Wickr messages exchanged between him and Agent Diaz were incomplete and that the

2

Government had failed to preserve some of these communications, and (2) based on a letter ostensibly penned by Lee and sent by Dmted to Agent Diaz, Lazar asserted that there was a question regarding Lee's involvement in the conspiracy and thus argued that the Government should have been ordered to disclose Lee's identity. Specifically, Lazar requested a spoliation instruction regarding the messages that he claimed were missing, and he also filed a *Roviaro* Motion, wherein he requested that the court order the Government to disclose Lee's identity. The court denied both Lazar's request for a spoliation instruction and his *Roviaro* Motion. In his motion for new trial, Lazar now claims that the court's denial of these two requests was erroneous, and, because of these claimed errors, Lazar asserts that a new trial is warranted.

II.  Analysis

Rule 33 of the Federal Rules of Criminal Procedure permits the court to vacate a judgment and grant a new trial on a defendant's motion if it determines that "the interest of justice so requires." FED. R. CRIM. P. 33(a); *United States v. McClaren*, 13 F.4th 386, 416 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 1244 (2022); *United States v. Chapman*, 851 F.3d 363, 380 (5th Cir. 2017); *United States v. Pratt*, 807 F.3d 641, 645 (5th Cir. 2015). The interest of justice does not require a new trial "unless there would be a miscarriage of justice or the weight of the evidence preponderates against the verdict." *Chapman*, 851 F.3d at 380 (quoting *United States v. Wall*, 389 F.3d 457, 466 (5th Cir. 2004), *cert. denied*, 544 U.S. 978 (2005)); *United States v. Lucas*, 849 F.3d 638, 643 (5th Cir. 2017) (quoting *United States v. Wright*, 634 F.3d 770, 775 (5th Cir.), *cert. denied*, 565 U.S. 849 (2011)). In considering a motion for new trial, the district court must carefully weigh the evidence and may assess the credibility of the witnesses. *United States v. Shoemaker*, 746 F.3d 614, 631 (5th Cir. 2014); *United States v. Herrera*, 559 F.3d 296, 302 (5th

Cir. 2009); *United States v. Hemen*, 202 F. Supp. 3d 629, 639 (E.D. Tex. 2016) (citing *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005)).  The court, however, "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Shoemaker*, 746 F.3d at 631 (quoting *United States v. Arnold*, 416 F.3d 349, 360 (5th Cir.), *cert. denied*, 546 U.S. 970 (2005)).

"Rule 33 divides motions for new trial based on the interest of justice into two different subcategories:  (1) motions based on newly discovered evidence; and (2) motions based on 'other grounds.'" *Wall*, 389 F.3d at 466 (citing FED. R. CRIM. P. 33(a)).  A Rule 33 motion grounded "on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty."  FED. R. CRIM. P. 33(b)(2).  Importantly, the court "does not have the authority to grant a motion for a new trial under Rule 33 on a basis not raised by the defendant." *Shoemaker*, 746 F.3d at 631-32 (quoting *United States v. Nguyen*, 507 F.3d 836, 839 (5th Cir. 2007)).

Here, Lazar claims that his motion for new trial should be granted for two distinct reasons. Lazar first contends that the court erred in refusing to grant his request for a spoliation instruction relating to various Wickr messages that he claims were not preserved.  On that point, Lazar argues that Agent Diaz acted in bad faith when allowing these messages to be destroyed; and, should the court disagree, Lazar asserts that "[t]he bad-faith standard" violates his "right to Due Process." Second, Lazar argues that the court erred by denying his *Roviaro* motion, wherein he requested that the Government be ordered to disclose the identity of Lee, a confidential informant.

A. Spoliation Instruction

"A district court has discretion to admit evidence of spoliation and to instruct the jury on adverse inferences." *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001). For a defendant "[t]o receive a spoliation jury instruction" he "must demonstrate bad faith or bad conduct" by the Government. *United States v. Valas*, 822 F.3d 228, 239 (5th Cir. 2016) (citing *Wise*, 221 F.3d at 156 ("An adverse inference drawn from the destruction of records is predicated on bad conduct.")); *see United States v. Glenn*, 935 F.3d 313, 320 (5th Cir. 2019). To show bad faith in the context of spoliation, even in a criminal case, a defendant must ordinarily demonstrate "that the unavailability of any evidence was because of intentional misconduct instead of oversight, error, ineptitude, or carelessness," or that "items were deliberately lost, altered, or destroyed for the purpose of hiding adverse evidence or depriving him of its use." *United States v. Thomas*, No. 22-60271, 2023 WL 1991573, at *1 (5th Cir. Feb. 14, 2023) (citing *Vick v. Tex. Emp. Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975) (adopting the bad-faith standard in the spoliation context); *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (addressing spoliation in the civil context and noting that "[b]ad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence")); *Wise*, 221 F.3d at 156 (applying the bad-faith standard in the criminal context); *see United States v. Denton*, No. 22-40020, 2023 WL 143169, at *1 (5th Cir. Jan. 10) (refusing "to adopt a lesser standard of culpability, such as negligence," as the court was "bound by the rule of orderliness"), *cert. denied*, 144 S. Ct. 74 (2023).

In this case, both parties appear to agree that two Wickr exchanges[1] were not preserved.[2] First, Agent Diaz testified that he was unable to preserve a message that he received from one of Lazar's co-conspirators that contained the initial murder-for-hire solicitation. Second, Agent Diaz failed to preserve a message ostensibly sent from Lazar to Agent Diaz informing him of the death of one of Lazar's family members. The existence of any missing Wickr messages beyond these two exchanges is disputed.

Nonetheless, in an effort to show bad faith, Lazar argues, based solely on his testimony at trial, that Agent Diaz must have acted in bad faith when failing to preserve various other Wickr exchanges. Lazar asserts that he sent Agent Diaz "messages containing reservations and second thoughts" regarding Lazar's willingness to finalize the agreement and "messages that further conveyed Lazar's understanding that he was brokering a domestically Romanian cocaine deal." In Lazar's view, these communications were in fact sent to Agent Diaz and possess obvious exculpatory value, such that they illustrate that Agent Diaz must have acted in bad faith when failing to preserve them.

Conversely, the Government contends that there are no missing Wickr messages with exculpatory value. Specifically, the Government argues that "Agent Diaz made it clear" that there were no "missing messages that would shed any contrary light on the numerous messages in which

---

[1] Even at this stage, Lazar continues to dispute the ephemerality of Wickr messages. The court notes, however, that Lazar has not provided any new evidence or insight regarding the function of the Wickr platform used in this case. In fact, Lazar previously raised these same arguments in his Motion to Strike (#129) (to which the Government filed a response (#130)); the court rejected these assertions and, accordingly, denied his motion on the record.

[2] While the Government's response to Lazar's motion for new trial seems to assume that a message regarding the death of one of Lazar's family members may have been missing or destroyed, the Government adamantly opposed any such suggestion at trial. In fact, it is unclear from Agent Diaz's testimony how he learned of the family member's death.

6

the defendant enthusiastically pursued the various objects of his criminal scheme." Moreover, the Government urges the court to give Lazar's claims regarding missing exculpatory messages "no credence" because he "lied extensively during his testimony."

As an initial matter, the messages that the parties agree were not preserved do not show bad faith on the part of Agent Diaz; nor does Lazar so contend. As the Government points out, Agent Diaz produced DEA-6 reports of the significant Wickr exchanges that he was unable to record, and these reports were disclosed to Lazar. Importantly, one of these DEA-6 reports recounted the conversation in which the murder-for-hire plot was first discussed. Further, although the Government, in its response, appears to assume that a Wickr exchange relating to Lazar's family member's death was not preserved, that alone does not support a finding of bad faith. Lazar apparently agrees that the exchanges regarding the initiation of the murder-for-hire plot with a co-conspirator and the death of a relative have no exculpatory value.

Consequently, Lazar's bad-faith argument is contingent upon the existence of multiple exculpatory messages that he claims to have sent to Agent Diaz, which Agent Diaz purportedly failed to preserve. The only support for these "obviously exculpatory" messages is Lazar's own testimony at trial—he provides no other support for the existence of these messages. Agent Diaz also weighed in on the existence of these messages during trial, and he plainly stated that he never received any messages of exculpatory value, such as messages discussing Lazar's reservations or second thoughts regarding the conspiracy. Thus, at bottom, this dispute comes down to the witnesses' credibility, and Agent Diaz's testimony was clearly deemed more credible by the jury, an assessment with which the court concurs. *See Thomas*, 2023 WL 1991573, at *1. Indeed, at least twice, the Government impeached Lazar during cross-examination. The Government

demonstrated that Lazar was given a chance to tell his side of the story, contrary to Lazar's contention that he was given no such opportunity, and the Government demonstrated that Lazar mentioned the town of "Silistra" in Bulgaria with reference to the transportation of money in furtherance of the conspiracy rather than to express the proper pronunciation. Accordingly, the court finds Lazar's claim that he sent other clearly exculpatory messages to Agent Diaz to be unsupported by the evidence and unworthy of credence.

Even setting aside the credibility issue, however, Lazar has provided no support for his contention that a claim of destroyed, potentially exculpatory evidence alone constitutes bad faith.[3] To the contrary, in this context, Lazar must do more than point to allegedly exculpatory evidence, claim it was improperly preserved, and, on those grounds alone, allege bad faith. *Cf. Armstrong v. Ashley*, 60 F.4th 262, 273 & n.11 (5th Cir. 2023); *see Thomas*, 2023 WL 1991573, at *1.[4] In

---

[3] The court does not discuss whether the evidence that Lazar claims was not preserved was actually exculpatory. Although, during his testimony at trial, Lazar explained what he claimed these purportedly missing messages discussed, because the evidence was not actually presented, and Lazar does not articulate exactly what was said in each of these messages, at this stage, the most that can be said about this evidence is that (if it existed) it was potentially exculpatory.

[4] A finding of bad faith is required in the context of both *Youngblood* claims (the destruction of, or failure to preserve, evidence in violation of due process) and spoliation claims (seeking an instruction and adverse inference based on the destruction of evidence). In his motion for new trial, Lazar recognizes that to succeed on his spoliation argument he must show bad faith on the part of the Government—specifically, Agent Diaz. In discussing bad faith, however, Lazar relies exclusively on cases (all from other circuits) discussing bad faith in the context of *Youngblood* claims. *See, e.g.*, *United States v. Estrada*, 453 F.3d 1208, 1212 (9th Cir. 2006), *cert. denied*, 549 U.S. 1137 (2007); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir.), *cert. denied*, 531 U.S. 1026 (2000); *In re Sealed Case*, 99 F.3d 1175, 1178 (D.C. Cir. 1996); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996); *United States v. Bohl*, 25 F.3d 904, 909 (10th Cir. 1994); *United States v. Femia*, 9 F.3d 990, 995-96 (1st Cir. 1993). Nonetheless, courts within the Fifth Circuit often analyze bad faith similarly in the context of *Youngblood* claims and spoliation claims. *See Glenn*, 935 F.3d at 320 (discussing bad faith in both the spoliation and due process contexts and finding no bad faith in both contexts); *see also Thomas*, 2023 WL 1991573, at *1 (same); *Denton*, 2023 WL 143169, at *1 (same); *United States v. Van Velkinburgh*, 342 F. App'x 939, 941 (5th Cir. 2009) (addressing a challenge to the district court's refusal to instruct the jury on spoliation) (citing *Wise*, 221 F.3d at 156 (discussing the bad faith requirement in the spoliation context); *United States v. Gibson*, 963 F.2d 708, 711 (5th Cir. 1992) (addressing the bad faith requirement

other words, Lazar's claim that exculpatory evidence was not preserved does not, in and of itself, satisfy the requirement that he show bad faith on the part of Agent Diaz. *See Armstrong*, 60 F.4th at n.11; *see also Thomas*, 2023 WL 1991573, at *1; *Wise*, 221 F.3d at 156. Lazar must show some intentional misconduct, or deliberate action on Agent Diaz's part; an allegation of his awareness of the content of the destroyed material, alone, is not enough. *See Thomas*, 2023 WL 1991573, at *1. Accordingly, Lazar has provided no argument or support from which to infer that there was any "intentional misconduct" on the part of Agent Diaz or that "items were deliberately lost, altered, or destroyed for the purpose of hiding adverse evidence or depriving [Lazar] of its use." *Id.* (citing *Guzman*, 804 F.3d at 713; *Wise*, 221 F.3d at 156).[5] At best, Lazar's contention

---

regarding destruction of evidence claims that raise a due process issue (*i.e.*, *Youngbloood* claims))). As such, while these standards have different origins, in practice, there appears to be little (if any) daylight between the two. *See, e.g.*, *Denton*, 2023 WL 143169, at *1 (looking for some intentional action or inaction on behalf of the government in both the *Youngblood* and spoliation contexts). Thus, although *Armstrong* discusses bad faith in the *Youngblood* context, the court finds its analysis to be persuasive, even if not controlling, in this context. 60 F.4th at 273. In *Armstrong*, the Fifth Circuit noted that, even where the appellant asserted that the government actor was aware of the alleged exculpatory value of the destroyed evidence, he was required to show that the government actor acted in bad faith. *Id*. As a result, *Armstrong* supports the conclusion that a defendant is unable to show bad faith based merely on his assertion that the government actor was aware of the alleged exculpatory value of the destroyed evidence—and this holding is consistent with the demands of a bad faith finding in the spoliation context. *See Thomas*, 2023 WL 1991573, at *1.

[5] The Fifth Circuit has refused to find bad faith in multiple cases involving the destruction of, or failure to preserve, potentially exculpatory electronic material. *See, e.g.*, *Glenn*, 935 F.3d at 320; *United States v. Moore*, 452 F.3d 382, 389-90 (5th Cir. 2006). In *Glenn*, the Fifth Circuit held that there was no evidence of bad faith where a government agent negligently allowed a Windows update to install, destroying at least ten gigabytes of data. 935 F.3d at 320. In *Moore*, the government retained only 16 of 282 taped prison telephone calls; the others were "recycled." 452 F.3d at 385. That is, they were destroyed after 180 days, per the Bureau of Prisons' policy. *Id*. at 389. The Fifth Circuit found that there was no evidence of bad faith; rather, the tapes were "destroyed pursuant to standard procedure." *Id*. Indeed, the court rejected Moore's argument that "bad faith can be inferred from the fact that only excerpts containing inculpatory evidence survived and that retaining all of the tapes would not have been unduly burdensome." *Id*. While potential abuses of a messaging system such as Wickr can be identified, Lazar does not contend that the Government chose this service in an effort to strengthen its case against him. Nor does Lazar contend that Agent Diaz's use of Wickr violated some DEA procedure. Indeed, in this case, the messages were destroyed based on Wickr's own unique procedure.

would support a claim of negligence, and the Fifth Circuit has repeatedly clarified that negligence is insufficient to show bad faith. *Denton*, 2023 WL 143169, at *1; *United States v. Rodriguez-Sanchez*, 741 F. App'x 214, 222 (5th Cir. 2018) (citing *Vick*, 514 F.2d at 737).

On a related note, in his motion, Lazar argues that, in the event that the court finds that he has failed to satisfy the bad faith standard, the court should nonetheless "grant a new trial because the Agent's conduct in this case was, without question, reckless."[6] A showing of recklessness, however, does not satisfy the level of culpability required to show bad faith in the context of spoliation in this circuit. *See, e.g.*, *Luxottica Grp., S.P.A. v. Ochoa's Flea Mkt., LLC*,

---

[6] Lazar also contends that the bad faith standard is unworkable and a violation of due process. Specifically, Lazar argues that "[p]lacing the burden on the accused to prove the subjective state of mind held by an officer imposes an impossible standard." To be sure, from its inception, the bad faith requirement in the context of a criminal case in which the government destroyed (or failed to preserve) potentially exculpatory evidence was undesirable to many, including four of the justices on the Supreme Court at the time *Youngblood* was decided. 488 U.S. at 61 (Stephens, J., concurring); *id*. at 342 (Blackmun, J., dissenting). Nonetheless, Lazar's argument wholly unavailing, and his citation to Justice Blackmun's dissenting opinion is, "[a]t the risk of stating the obvious," plainly unhelpful. *See United States v. Hood*, 615 F.3d 1293, 1300 (10th Cir. 2010). In any event, the bad faith requirement is, by no means, a due process violation in its own right. Lazar ignores the reasons for a bad faith standard in cases such as this. The standard accounts for the fact that where "potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed," and the standard also avoids "imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 57-58. Notably, despite relying on *Youngblood*'s articulation of the bad faith standard, Lazar does not claim that the Government or Agent Diaz destroyed potentially exculpatory evidence in violation of his due process rights consistent with *Youngblood*. Indeed, *Youngblood*, in combination with *California v. Trombetta*, 467 U.S. 479, 486 (1984), requires more than a showing of bad faith alone to succeed on a due process claim.

Importantly, in other contexts concerning the disclosure of evidence, courts do not require a showing of bad faith. For example, bad faith is irrelevant to whether the government has satisfied its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). Lazar, however, does not claim that the Government's actions constituted a *Brady* violation, and his motion does not demonstrate that he could establish such a violation even if it were asserted. *See Glenn*, 935 F.3d at 319 ("To establish a *Brady* violation, a defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." (quoting *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir.), *cert. denied*, 580 U.S. 859 (2016))).

No. 7:20-CV-00061, 2022 WL 836823, at *4 (S.D. Tex. Mar. 21, 2022) ("The Court holds that, while Defendants acted negligently or even recklessly in discarding vendor records, Defendants' culpability does not rise to bad faith."); *see also Thomas*, 2023 WL 1991573, at *1 (requiring intentional misconduct or deliberate action); *Rogers v. Averitt Express, Inc.*, 215 F. Supp. 3d 510, 518 (M.D. La. 2017) ("Numerous district courts within the Fifth Circuit have also found that, to constitute bad faith, the spoliating party must essentially act with the purpose of destroying the evidence."). In any event, Lazar's motion does not clearly demonstrate that Agent Diaz's conduct was reckless. *See Reckless*, BLACK'S LAW DICTIONARY (11th ed. 2019) (recklessness requires "a conscious (and sometimes deliberate) disregard for or indifference" to a "substantial and unjustifiable risk").

In this vein, Lazar's reliance on *United States v. Elliott*, 83 F. Supp. 2d 637, 651 (E.D. Va. 1999) is of no benefit. Aside from being non-binding, its holding conflicts with the bad faith standard for spoliation instructions in the Fifth Circuit.[7] *See Thomas*, 2023 WL 1991573, at *1. Indeed, as other courts have observed, "to the extent that *Elliott* stands for the proposition that a *mens rea* of no greater magnitude than recklessness is required to demonstrate bad faith, it stands alone." *United States v. Kendrick*, No. 10-CR-6096-FPG, 2015 WL 2129573, at *7 (W.D.N.Y.

---

[7] *Elliott* dealt with bad faith in the *Youngblood* context rather than the spoliation context. In *Elliott*, following a vehicular search, the DEA seized, among other things, "laboratory glassware" that was suspected to have been used to manufacture methamphetamine, and some of that glassware was "smeared with the residue of an unidentified substance." 83 F. Supp. 2d at 640. The glassware was transported to the DEA Office and, after being subjected to a fingerprint analysis, was destroyed in contravention of DEA protocols. *Id*. The Virginia District Court held that "where the law enforcement officer acted in a manner which was either contrary to applicable policies and the common sense assessments of evidence reasonably to be expected of law enforcement officers or was so unmindful of both as to constitute the reckless disregard of both, there is a showing of objective bad faith sufficient to establish the bad faith requirement of the *Trombetta/Youngblood* test." *Id*. at 647-48. Importantly, the court noted that there was "no evidence that the DEA Agent's subjective purpose in ordering destruction of the evidence" was to keep it from the defendant. *Id*. at 647 n.12.

Apr. 29, 2015); *see United States v. Vera*, 231 F. Supp. 2d 997, 1001 (D. Or. 2001) (noting that *Elliott* was not controlling, and finding that, to demonstrate bad faith, a more culpable mental state was required than recklessness).

Moreover, the fact that the court denied Lazar's request for a spoliation instruction during trial "does not mean that [he] was denied the opportunity to present [his] spoliation claim" to the jury. *Wise*, 221 F.3d at 156. Thus, Lazar was "not 'deprived of the opportunity to effectively attack the mishandling of evidence.'" *Id.* at 157. In fact, Lazar took the stand and testified that he sent multiple messages to Agent Diaz that were beneficial to his defense, which Agent Diaz failed to preserve. The jury, after hearing Lazar's assertions and his lawyers' arguments, nonetheless found Lazar guilty of all the charged offenses. Accordingly, Lazar has failed to show that he was entitled to a spoliation instruction. As the Fifth Circuit observed in *Scroggins*, no "miscarriage of justice . . . occurred at trial" and a new trial is not warranted based on the denial of a spoliation instruction.[8] *United States v. Scroggins*, 485 F.3d 824, 831 (5th Cir. 2007); *see Chapman*, 851 F.3d at 380.

B.     *Roviaro* Motion

The Government possesses the "informant privilege," which generally allows it "to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *United States v. Alaniz*, 726 F.3d 586, 609 (5th Cir. 2013) (quoting *Roviaro v. United States*, 353 U.S. 53, 59 (1957)). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The

---

[8] In his motion for new trial, Lazar makes references to both Federal Rule of Criminal Procedure 16(a)(1)(B)(i) and the Jencks Act, 18 U.S.C. § 3500(a). Nonetheless, to warrant a spoliation instruction, Lazar was required to show bad faith on the part of Agent Diaz.

privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Roviaro*, 353 U.S. at 59; *Alaniz*, 726 F.3d at 609. The "informant privilege" is, however, "not absolute, and there is 'no fixed rule' for when a confidential informant's identity should be disclosed." *United States v. Ortega*, 854 F.3d 818, 824 (5th Cir. 2017) (quoting *Roviaro*, 353 U.S. at 60-62). Rather, "[t]he problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *United States v. Jones*, 930 F.3d 366, 381 (5th Cir. 2019) (quoting *Roviaro*, 353 U.S. at 62). Courts "apply a three factor test to determine whether the identity of a confidential informant should be disclosed: '(1) the level of the informant's activity; (2) the helpfulness of the disclosure to the asserted defense; and (3) the Government's interest in nondisclosure.'" *Id.* (quoting *Ortega*, 854 F.3d at 824).

Regarding the level of Lee's activity, Lazar contends that, rather than serving only as a tipster, Lee "actually participated" in the New Zealanders' criminal activity. Lazar bases this assertion on a letter, ostensibly written by Lee (while Lee and Cui were incarcerated in the same New Zealand facility) and then given to Cui to send to Agent Diaz through Wickr. The Government maintains that Lee's "involvement in the criminal activity was minimal." It argues that Lee "made the initial introduction between Agent Diaz and Cui but then did nothing to participate in the conspiracy or advance the investigation aside from penning the letter he sent Cui." The parties dispute the letter's significance. Read in full, it appears that Lee wrote this letter to Diaz on behalf of Lazar's co-conspirators. The letter emphasizes Lazar's co-conspirators' and Lee's faith in Agent Diaz's reliability and was likely sent at a time when Lazar's

13

co-conspirators were concerned that their "deal" with Agent Diaz would unravel. Nonetheless, while the letter suggests that Lee communicated with Cui, it does not demonstrate that Lee was an "active participant in the charged offenses," *Ortega*, 854 F.3d at 824, such that he was more than a "mere tipster," much less a co-conspirator, as Lazar suggests. *See Jones*, 930 F.3d at 381; *see also United States v. Orozco*, 982 F.2d 152, 155 (5th Cir.) ("[M]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." (quoting *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979))), *cert. denied*, 508 U.S. 945 (1993). Indeed, because Lee connected Cui with Agent Diaz, when Cui may have began to question Agent Diaz's trustworthiness, Lee could have written the letter to appease Cui and to keep himself out of harm's way. Nonetheless, even if the letter were a window to Lee's greater involvement, the other two factors tip the balance heavily in favor of nondisclosure.

With respect to the helpfulness of disclosure, Lazar fails to explain how or why the disclosure of Lee's identity would have been helpful to his defense. The Government correctly points out that Lee had no contact with Lazar. Lazar does not explain how gaining further understanding of Lee's involvement would have aided him in contending at trial that he is not guilty of the offenses alleged. Hence, Lazar has not demonstrated that Lee's identity was "essential to his defense beyond unsubstantiated speculation, and therefore, the second factor also weighs against disclosure." *Ortega*, 854 F.3d at 825.

Finally, the Government contends that because "Lee provided information about high-level drug traffickers," "is no longer in custody," and "cannot be placed in protective housing," "Lee's safety would surely be endangered if his identity were to be revealed." Accordingly, the Government maintains that its interest in nondisclosure is "substantial." *See United States v. De*

*Los Santos*, 810 F.2d 1326, 1332 (5th Cir. 1987).  In his motion, Lazar does not address this factor; thus, the third factor also weighs in favor of nondisclosure.  Accordingly, the court properly denied Lazar's *Roviaro* motion at trial, and a new trial is not warranted.  *See Chapman*, 851 F.3d at 380; *Scroggins*, 485 F.3d at 831.

III. Conclusion

Lazar has failed to show that either the court's denial of his request for a spoliation instruction or its denial of his *Roviaro* motion warrants a new trial.  Accordingly, for the foregoing reasons, Lazar's Motion for New Trial (#153) is DENIED.

SIGNED at Beaumont, Texas, this 26th day of March, 2024.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE